## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.: _____

RAJAE BOUHAMIDI,

      Plaintiff,

v.

CORRECTIONAL OFFICER JUSTIN TORRES, in his individual capacity,
EXECUTIVE DIRECTOR MOSES "ANDRE" STANCIL, in his individual capacity capacity;
WARDEN RYAN LONG, in his individual capacity, and
ASSOCIATE WARDEN LUCILLE REAUX, in her individual capacity,

      Defendants.

---

### COMPLAINT AND JURY DEMAND

---

      Plaintiff Rajae Bouhamidi, by and through her undersigned attorneys, David A. Lane, Liana G. Orshan, and Maddie S. Lips of KILLMER LANE, LLP, respectfully alleges for her Complaint and Jury Demand as follows.

## I. INTRODUCTION

1.      This is an action for damages and other relief against the prison official who sexually assaulted Ms. Rajae Bouhamidi while she was an inmate at Denver Women's Correctional Facility, and the prison officials whose actions and inactions led to Ms. Bouhamidi's repeated assault. Ms. Bouhamidi is the victim of a system that looked the other way as Defendant Justin Torres treated Ms. Bouhamidi as an object of his own sexual gratification. As a result, Ms. Bouhamidi has sustained emotional injuries.

## II. JURISDICTION AND VENUE

2.      This action arises under the Constitution and laws of the United States.

3.      Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. § 1331.

Jurisdiction supporting Plaintiff's claims for attorney fees and costs is conferred by 42 U.S.C.

§ 1988.

4.      Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of

the events alleged herein occurred within the State of Colorado, and all of the parties were

residents of the State of Colorado at all times relevant to the subject matter of this Complaint.

### III. PARTIES

**Plaintiff:**

5.      At all times relevant to the subject matter of this Complaint, Plaintiff Rajae

Bouhamidi was a citizen of the United States and a resident of the State of Colorado.

6.      During the relevant time period, Ms. Bouhamidi was detained at Denver Women's

Correctional Facility, a facility within the Colorado Department of Corrections ("DOC").

7.      Because Ms. Bouahmidi grieved the conduct at issue in this Complaint and her

grievance resulted in an investigation by DOC, all available administrative remedies have been

exhausted to the extent required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a).

There are no other administrative exhaustion requirements that would pose as a bar to the claims

asserted herein.

**Defendants:**

8.      The Denver Women's Correctional Facility ("DWCF"), located at 3600 Havana

Street, Denver, CO 80239, is a prison in the Colorado state prison system. It is operated by the

Colorado Department of Corrections ("DOC"), an agency of the State of Colorado that operates

state prisons and is responsible for maintaining and providing for the care, custody, and

supervision of individuals detained at such prisons and jails.

5.      At all times relevant to the subject matter of this litigation, Defendant Moses "Andre" Stancil was a citizen of the United States and a resident of Colorado and was acting under color of state law and within the scope of his employment in his capacity as the Executive Director of DOC. Pursuant to Colorado law, Mr. Stancil is the state official who manages, supervises, and controls the correctional institutions operated by the State of Colorado, including DWCF, and who is responsible for developing policies and procedures with respect to the operation of DOC and its facilities like DWCF.

6.      At all times relevant to the subject matter of this litigation, Defendant Ryan Long was a citizen of the United States and a resident of Colorado and was acting under color of state law and within the scope of his employment in his capacity as Warden of DWCF. As the Warden, Mr. Long was responsible for overseeing all operations at DWCF, including establishing procedures for the operations of DWCF on a day-to-day basis, the hiring of prison staff, ensuring that all DWCF employees were properly trained, and establishing internal security procedures.

7.      At all times relevant to the subject matter of this litigation, Defendant Lucille Reaux was a citizen of the United States and a resident of Colorado and was acting under color of state law and within the scope of her employment in her capacity as Associate Warden of DWCF, which included overseeing operations and hiring, training, and supervision of all staff at DWCF.

8.      At all times relevant to the subject matter of this litigation, Defendant Justin Torres was a citizen of the United States and a resident of Colorado and was acting under color of state law and within the scope of his employment in his capacity as a Correctional Officer employed at DWCF.

## IV. FACTUAL ALLEGATIONS

### *Defendant Torres sexually harassed Ms. Bouhamidi at DWCF.*

9.      During the relevant time period, Plaintiff Rajae Bouhamidi, who is female, was an inmate under the custody of DOC who was housed at DWCF.

10.      At the end of 2022, Ms. Bouhamidi started working in the kitchen at DWCF. Part of her assigned duties was to serve meals.

11.      At that time, Defendant Justin Torres, a male correctional officer working at DWCF, was also posted in the kitchen.

12.      Shortly after Ms. Bouhamidi started working in the kitchen, Defendant Torres began to sexually harass Ms. Bouhamidi.

13.      Mr. Torres started repeatedly complimenting Ms. Bouhamidi's appearance or telling her that he wanted to marry her.

14.      Accustomed to similar comments from other DWCF staff and afraid of retaliation from Defendant Torres, Ms. Bouhamidi did not report the comments.

15.      Other people noticed Defendant Torres' inappropriate interest in Ms. Bouhamidi.

16.      For example, Correctional Officer Harris, also stationed in the kitchen, made several observations to Ms. Bouhamidi about Defendant Torres' behavior, including that Defendant Torres followed Ms. Bouhamidi around, that it was obvious that Defendant Torres liked Ms. Bouhamidi, and that Defendant Torres always wanted to be close to Ms. Bouhamidi.

17.      Other inmates also repeatedly made comments to Ms. Bouhamidi to the effect that Defendant Torres was interested in her and would ask about her when she was not around.

### *Defendant Torres repeatedly sexually assaulted Ms. Bouhamidi in the staff restroom at DWCF.*

18.      Defendant Torres started to take more shifts in the kitchen when Ms. Bouhamidi

was working there.

19.     After a few weeks of verbal harassment, starting on or about February 1, 2023, Defendant Torres began ordering Ms. Bouhamidi to clean the staff restroom. To do so required removing Ms. Bouhamidi from her duties in the kitchen.

20.     The staff restroom is not under video surveillance and is secluded from other staff and inmates.

21.     Defendant Torres threatened to give Ms. Bouhamidi a negative "chron"—an informational note in her record which can result in a formal write up if several are accumulated—if she did not agree to clean the staff restroom. He told her he would give her a positive "chron" if she did clean the bathroom.

22.     Defendant Torres further threatened Ms. Bouahmidi that he would write her up for disobeying a lawful order if she did not comply

23.     As an inmate subject to Defendant Torres' control, Ms. Bouhamidi felt that she had no option but to oblige.

24.     While Ms. Bouhamidi was cleaning the staff restroom, alone and outside the scope of surveillance cameras, Defendant Torres started to sexually assault her.

25.     For example, frequently when Ms. Bouhamidi bent down to clean, sweep, or mop, Defendant Torres pressed his body weight against Ms. Bouhamidi. When Defendant Torres did so, Ms. Bouhamidi felt Defendant Torres' aroused genitals against her backside.

26.     Defendant Torres also repeatedly groped Ms. Bouhamidi's breasts and genitals, kissed her neck, and smelled her hair, telling her it smelled like green apple.

27.     Ms. Bouahmidi responded to these assaults by trying to push Defendant Torres off of her.

28.     On at least one occasion, Defendant Torres walked up from behind Ms. Bouhamidi, pressed his body against hers, and put his hand down Ms. Bouhamidi's pants, briefly penetrating her vaginally with his finger.

29.     To minimize Defendant Torres' opportunity to assault her, Ms. Bouhamidi attempted to clean the staff restroom very quickly. When she did so, Defendant Torres would order Ms. Bouhamidi to take her time and clean the restroom again, telling her she missed a spot.

30.     Ms. Bouhamidi repeatedly showed no interest in Defendant Torres, and she told Defendant Torres that what he was doing was wrong. She tried to move away from him when he touched her and pressed himself against her.

31.     Despite Ms. Bouhamidi's clear disinterest, Defendant Torres ordered Ms. Bouhamidi to clean the staff restroom every chance he got. This ranged from once a week to multiple times in the same week, and even on back-to-back days.

32.     At one point, Defendant Torres was assigned to the tower and then only posted to the kitchen on Sunday. Each Sunday, then, he required Ms. Bouahmidi to clean the staff bathroom.

33.     Ms. Bouhamidi cleaned the staff restroom so frequently, and received so many positive "chrons" from Defendant Torres for doing so, that on one occasion she was able to pick from a grab box of women's hygiene products as a reward.

34.     In April or May 2023, in an effort to escape Defendant Torres' unrelenting sexual abuse, Ms. Bouhamidi stopped reporting to the kitchen for work. She did so even with the knowledge that she could be written up.

35.     Ms. Bouhamidi received at least one negative "chron" for her failure to report to the kitchen, but she did not try to explain her absence or file a formal grievance against

Defendant Torres because she was afraid of retaliation.

***Despite Ms. Bouhamidi attempts to evade Defendant Torres, he continually sought out opportunities to sexually harass her.***

36.     Shortly after Ms. Bouhamidi stopped reporting to the kitchen for work, Defendant Torres was reassigned to Ms. Bouhamidi's unit.

37.     Ms. Bouhamidi suspected that Defendant Torres requested his assignment to be changed so that he could have access to her again.

38.     Although Defendant Torres no longer had a way to isolate Ms. Bouhamidi to physically sexually abuse her, he continued to sexually harass Ms. Bouhamidi.

39.     Defendant Torres repeatedly touched Ms. Bouhamidi's back or butt when she got out of the shower or ran his hands through her hair as he was doing rounds in her unit.

40.     Defendant Torres constantly told Ms. Bouahmidi he wanted to marry her.

41.     Other inmates noticed this and made comments to Ms. Bouhamidi that she was Defendant Torres' "favorite."

42.     Ms. Bouhamidi tried to stay away from Defendant Torres, but he continually sought out opportunities to be near her.

43.     For example, Defendant Torres would call Ms. Bouhamidi over to speak to him and would communicate with her via the intercom in her room.

44.     Again, Ms. Bouhamidi felt that she had no choice but to talk to Defendant Torres when he called for her because he could impose discipline against her.

45.     On May 15, 2023, Ms. Bouhamidi was transferred to La Vista Correctional Facility.

46.     Ms. Bouhamidi's friends from DWCF wrote to Ms. Bouhamidi at La Vista that Defendant Torres was asking about her, and that he said he would be waiting for her when she

was released from prison.

### ***Defendant Torres continued to sexually harassment Ms. Bouhamidi once she was released from the Colorado Department of Corrections.***

47.     In October 2023, Ms. Bouhamidi was released from DOC.

48.     In November of 2023, Defendant Torres reached out to Ms. Bouhamidi via Facebook under the pseudonym "Jay Monet."

49.     Defendant Torres repeatedly texted Ms. Bouhamidi via Facebook Messenger and called her via Facebook video call.

50.     Ms. Bouhamidi occasionally replied to Defendant Torres' messages and calls because she was afraid of retaliation if she did not.

51.     On a few occasions, Defendant Torres asked to see Ms. Bouhamidi's breasts or genitals on a video call.

52.     Ms. Bouhamidi ended the calls when Defendant Torres would make these requests.

53.     Another correctional officer from DWCF, Correctional Officer Powell, also contacted Ms. Bouahmidi after her release. Powell repeatedly asked her for sex and explicitly photos.

### ***Ms. Bouhamidi attempted to grieve Defendant Torres' sexual harassment and abuse at La Vista Correctional Facility.***

54.     In 2024, Ms. Bouhamidi returned to DOC and was again assigned to DWCF, where Defendant Torres remained as a correctional officer.

55.     Though Defendant Torres did not attempt to sexually assault Ms. Bouhamidi again, she observed other female inmates receiving similar attention from Defendant Torres. She observed him flirting with other female inmates and taking posts to be near them.

56.    One inmate in particular informed Ms. Bouhamidi that she and Defendant Torres had secret hand signals: Defendant Torres would make a certain sign with his hands if he wanted to have sexual intercourse with her, and he would make a different sign if he wanted oral sex.

57.    Later, Defendant Torres made one of these hand signals to Ms. Bouhamidi.

58.    Ms. Bouhamidi confronted Defendant Torres about the sign, and she told him she knew what the signal meant.

59.    After Ms. Bouhamidi confronted him, Defendant Torres' face turned flush out of embarrassment, and he avoided Ms. Bouhamidi for the rest of the day.

60.    Shortly thereafter, Ms. Bouhamidi was transferred to La Vista Correctional Facility.

61.    Away from Defendant Torres' control, Ms. Bouhamidi filed a formal grievance against Defendant Torres in or around September of 2024.

62.    Ms. Bouhamidi was informed by her shift commander that Defendant Torres' sexual harassment at DWCF was not a grievance matter but rather a criminal matter. DOC officials repeatedly refused to allow her to continue with the grievance process.

63.    In response to Ms. Bouhamidi's grievance, DOC Office of Inspector General (OIG) initiated an investigation.

64.    An assigned OIG investigator, Desmond Manning, met with Ms. Bouhamidi at various times to discuss Defendant Torres' sexual abuse.

65.    DOC suspended Defendant Torres from his duties at DWCF while the investigation is pending.

66.    At the time of filing this Complaint, the OIG investigation is not yet complete.

67.    Ms. Bouhamidi suffered and continues to suffer emotional trauma resulting from

Defendant Torres' sexual abuse.

### *Guards at DWCF have a history of sexual abuse of female inmates.*

68.     In 2009, an inmate at DWCF, "A.H.," was awarded $1.3 million against a former DWCF guard who had repeatedly coerced her into performing sexual acts and then raped her. The same guard had previously engaged in sexual misconduct with other female inmates, a fact well known to prison officials.

69.     Prison officials, including the Office of the Executive Director of DOC and Defendant Stancil, Office of the Associate Warden of DWCF and Defendant Reaux, and the Office of the Warden of DWCF and Defendant Long, knew of ongoing and pervasive sexual misconduct and abuse perpetrated by DOC prison officials against inmates housed at DWCF through receipt of letters, grievances, kites, formal complaints, and civil suits filed by DWCF inmates regarding widespread sexual abuse of inmates by prison officials.

70.     As part of a 2009 settlement between A.H. and DOC officials, DOC agreed to conduct supplemental annual training under the Prison Rape Elimination Act ("PREA"), focused on preventing DOC employee-on-inmate sexual contact. DOC also agreed to uphold a "zero tolerance" policy consistent with PREA regarding DOC employee-on-inmate sexual contact, including mandating that DOC employees report any information regarding DOC employee-on-inmate sexual contact, with failure to do so resulting in discipline.

71.     Yet in 2011 and 2012, DWCF had the *highest rate in the country* of alleged sexual assault or misconduct by correctional facility staff members against inmates, with an estimated 10.7% of inmates claiming they were victims of sexual assault or sexual misconduct by staff members. This rate was 4 times the national average. Of all DWCF inmates subjected to sexual misconduct by staff, 7.3% reported they had been physically coerced or threatened with physical

force, 10 times higher than the national average.

72.    Thus, despite its professed "zero-tolerance" policy in 2009, DWCF officials and supervisors, including Defendants Stancil, Reaux, and Long ("Supervisory Defendants"), subsequently failed to institute appropriate measures to protect inmates, including Ms. Bouhamidi, from the known risk of sexual misconduct and assault by correctional officers.

73.    Showing that the pattern of known abuse continued without adequate remedial measures taken, in 2022, DOC settled a lawsuit brought by Plaintiff Susan Ullery, a former DWCF inmate, for $300,000. Ms. Ullery's lawsuit was based on a DOC employee sexually assaulting her while at DWCF, and brought against several DOC officials who failed to protect her from the risk of sexual assault despite their knowledge of such risk.

74.    Notably, the employee who sexually abused Ms. Ullery was not terminated, but rather allowed to retire with full retirement benefits, sending a message to all DOC employees that DOC does not punish those who commit sexual assault against DWCF inmates.

75.    DOC's tacit approval of sexual assault by DWCF employees sends a clear and unequivocal message to those employees—such approval and failure to appropriate respond actually trains DWCF employees—that sexual assault against inmates is acceptable, consistent with policy, and is approved practice, causing such sexual assault to be likely or even inevitable in the future.

76.    Supervisory Defendants are responsible for training DWCF employees to ensure they perform their duties consistent with the law and to discipline their improper conduct, so officers can learn from their experiences and be deterred from engaging in future misconduct that violates the constitutional rights of DWCF inmates. Supervisory Defendants' failure to do so has communicated to DOC employees, including Defendant Torres, that sexual assault against

DWCF inmates is authorized. In this sense, the failure to discipline constitutes training which authorizes future similar unconstitutional conduct.

77.    Defendants Stancil, Long, and Reaux knowingly, recklessly, and intentionally disregarded obvious serious risks to Ms. Bouhamidi and other DWCF inmates posed by widespread and pervasive sexual abuse of inmates at DWCF in at least the following ways:

    a.   failing to take timely substantive remedial actions to address the known, ongoing, pervasive problem of sexual abuse by prison staff against DWCF inmates;

    b.   failing to properly hire, train, and/or supervise prison personnel, including Defendant Torres, to prevent and/or address known pervasive sexual abuse of DWCF inmates by prison staff, despite the obvious need to do so;

    c.   continuing to employ DWCF prison staff in positions that allow them unsupervised access to female inmates; and

    d.   failing to maintain a proper video surveillance system in all locations where inmates have contact with guards.

78.    This conduct amounts to deliberate indifference to the rights of the inmates housed at DWCF, including Ms. Bouhamidi, and was so grossly reckless that the sexual misconduct against Ms. Bouhamidi was virtually inevitable.

## V. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Eighth Amendment – Cruel and Unusual Punishment Clause
### Excessive Force

79.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

80.     Defendants Stancil, Reaux, and Long ("Supervisory Defendants") and Defendant Torres were acting under color of state law and within the scope of their employment at all times relevant to this action.

81.     Defendant Torres purposefully and knowingly used physical force against Ms. Bouhamidi by touching her breasts and buttocks, pressing his groin against her, and forcibly penetrating her vagina without her consent.

82.     Defendant Torres' use of force against Ms. Bouhamidi caused her unnecessary and wanton pain.

83.     Defendant Torres' use of force against Ms. Bouhamidi had no legitimate penological purpose.

84.     The force used by Defendant Torres against Ms. Bouhamidi thus was used maliciously and sadistically for the very purpose of causing harm.

85.     For years before Ms. Bouhamidi's assault, Supervisory Defendants knew of and failed to take reasonable measures to abate the substantial risk of serious harm to inmates posed by widespread sexual abuse by DWCF prison staff against inmates.

86.     It would have been obvious to those in Supervisory Defendants' positions that inmates at DWCF, including Ms. Bouhamidi, faced a substantial risk of serious harm from sexual abuse by staff.

87.     Supervisory Defendants failed to provide humane conditions of confinement for Ms. Bouhamidi and other similarly situated inmates by failing to implement practices, policies and procedures that protected inmates, including Ms. Bouhamidi, from the substantial risk of serious harm posed by prison staff using their positions to sexually harass and assault inmates.

88.    The Supervisory Defendants, by and through their official duties within DOC, failed to properly train, supervise, and/or discipline their employees, including Defendant Torres, regarding sexual assault and harassment of inmates resulting in inhumane conditions of confinement.

89.    In light of the post-2009 history of widespread and persistent sexual abuse by DWCF staff against inmates, the need for additional and effective training, supervision, and discipline of guards regarding sexual acts with inmates was obvious.

90.    Supervisory Defendants thus knew that their acts or omissions were substantially certain to cause DWCF officials to violate the constitutional rights of inmates like Ms. Bouhamidi to be free from excessive force in the form of sexual abuse, and Supervisory Defendants consciously or deliberately chose to disregard this risk of harm in failing to provide and/or in deliberately choosing not to provide additional effective training, supervision, and discipline of guards regarding sexual acts with inmates.

91.    Therefore, Supervisory Defendants set in motion a series of events that they knew would cause an inmate in a similar situation as Ms. Bouhamidi to be deprived of her constitutional right to be free from excessive force; but for the above acts or omissions of Supervisory Defendants, Ms. Bouhamidi would not have been subjected to a violation of her constitutional rights; and such a deprivation was a natural and foreseeable consequence of these acts and omissions.

92.    Supervisory Defendants' failure to properly train, supervise, and discipline their employees, including Defendant Torres, was the proximate cause of the violation of Ms. Bouhamidi's constitutional rights.

93.    Defendant Torres' and the Supervisory Defendants' actions and inactions were

taken in reckless and callous indifference to the federally protected rights of Ms. Bouhamidi.

94.     The acts or omissions of Defendant Torres and Supervisory Defendants were the legal and proximate cause of Ms. Bouhamidi's damages in that she suffered physical intrusion into bodily privacy and integrity, humiliation, and mental and emotional pain and anguish, and continues to suffer mental and emotional pain and anguish to this day and likely for the rest of her life.

95.     As a direct and proximate cause and consequence of the unconstitutional policies, procedures, customs, acts, inactions, and/or practices described above, Ms. Bouhamidi suffered and continues to suffer injuries, damages, and losses as set forth herein.

## SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Fourteenth Amendment – Substantive Due Process Clause
### Invasion of Bodily Integrity

96.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

97.     Defendants Stancil, Reaux, and Long ("Supervisory Defendants") and Defendant Torres were acting under color of state law and within the scope of their employment at all times relevant to this action.

98.     By sexually harassing and assaulting Ms. Bouhamidi without her consent, Defendant Torres violated Ms. Bouhamidi's right to be secure in her bodily integrity, a liberty interest protected by the Due Process Clause of the Fourteenth Amendment.

99.     Supervisory Defendants recklessly, with conscious disregard to the serious and obvious risk to the safety of inmates like Ms. Bouhamidi, violated Ms. Bouhamidi's right to be secure in her bodily integrity by allowing pervasive sexual abuse by prison personnel against inmates to continue in at least the following ways:

    a.   by failing to take effective remedial actions to address the known, ongoing, pervasive problem of sexual abuse by prison personnel against inmates;

    b.   by failing to properly train, and/or supervise prison personnel to prevent and/or address pervasive sexual assault by prison personnel against inmates at DWCF;

    c.   continuing to employ DWCF prison staff in positions that allow them unsupervised access to female inmates; and

    d.   failing to maintain a proper video surveillance system in all locations where inmates had contact with guards.

100.    Supervisory Defendants, by and through their official duties within DOC, failed to properly and effectively train, supervise, and/or discipline their employees, including Defendant Torres, regarding sexual abuse of inmates, resulting in an unconstitutional invasion of Ms. Bouhamidi's bodily integrity and a deliberate indifference to the substantial risk of serious harm to Ms. Bouhamidi and other similarly situated inmates.

101.    Supervisory Defendants knew that their acts or omissions were substantially certain to cause DWCF officials to violate constitutional rights of inmates like Ms. Bouhamidi to be free from secure in their bodily integrity, and Supervisory Defendants consciously or deliberately chose to disregard this risk of harm in failing to provide and/or in deliberately choosing not to provide additional effective training, supervision, and discipline of guards, regarding sexual acts with inmates.

102.    In light of the duties and responsibilities of DOC personnel who exercise control over individuals incarcerated at DWCF, and the post-2009 history of sexual abuse by guards

against inmates, the need for training, supervision and discipline regarding sexual acts with inmates was so obvious, and the inadequacy of appropriate hiring, training, and/or supervision was so likely to result in the violation of constitutional rights, such as those described herein, that Supervisory Defendants' failure to appropriately train and/or supervise DOC personnel like Defendant Torres and his direct supervisors constituted deliberate indifference to the rights of inmates like Ms. Bouhamidi to be secure in their bodily integrity.

103.    Supervisory Defendants, by and through their official duties within DOC, proximately caused an unconstitutional invasion of Ms. Bouhamidi's bodily integrity by failing to implement effective practices, policies, and procedures that would have protected inmates, including Ms. Bouhamidi, from the substantial and known risk of serious harm posed by prison personnel using (and abusing) their authority and influence to sexually abuse inmates.

104.    Supervisory Defendants set in motion a series of events that they knew would cause an inmate in a similar situation as Ms. Bouhamidi to be deprived of her constitutional right to be secure in her bodily integrity; but for the above acts or omissions of Supervisory Defendants, Ms. Bouhamidi would not have been subjected to a violation of her constitutional rights; and such a deprivation was a natural and foreseeable consequence of these acts and omissions.

105.    Such policies, as well as Defendants' actions and inactions, violated Ms. Bouhamidi's substantive due process right to bodily integrity under the Fourteenth Amendment to the United States Constitution.

106.    Defendant Torres' and the Supervisory Defendants' actions and inactions were taken in reckless and callous indifference to the federally protected rights of Ms. Bouhamidi.

107.    When viewed in total, this conduct is outrageous and shocks the conscience. Among other things, despite Supervisory Defendants' knowledge of continuing and pervasive sexual assault by guards against inmates at DWCF since the 2009 rape of A.H., Supervisory Defendants failed to take appropriate actions to protect inmates like Ms. Bouhamidi, even knowing the severe harm that befell A.H. from the same failures years before.

108.    The acts or omissions of Defendant Torres and Supervisory Defendants were the legal and proximate cause of Ms. Bouhamidi's damages in that she suffered physical intrusion into bodily privacy and integrity, humiliation, and mental and emotional pain and anguish, and continues to suffer mental and emotional pain and anguish to this day and likely for the rest of her life.

109.    As a direct and proximate cause and consequence of the unconstitutional policies, procedures, customs, and/or practices described above, Ms. Bouhamidi suffered and continues to suffer injuries, damages and losses as set forth herein.

### THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Fourteenth Amendment – Equal Protection Clause
### Sexual Harassment

110.    Ms. Bouhamidi hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

111.    Defendants Stancil, Reaux, and Long ("Supervisory Defendants") and Defendant Torres were acting under color of state law and within the scope of their employment at all times relevant to this action.

112.    Ms. Bouhamidi is female and therefore a member of a protected class under the Fourteenth Amendment to the United States Constitution.

113.    Defendant Torres discriminated against and otherwise abused Ms. Bouhamidi because of her sex.

114.    Defendant Torres mistreated Ms. Bouhamidi by, among other things, repeatedly and intentionally sexually harassing and assaulting her as more fully described above.

115.    Defendant Torres abused his authority for the purpose of his own sexual gratification.

116.    Defendant Torres knew at all relevant times that Ms. Bouhamidi had no interest in having sexual contact with him.

117.    Defendant Torres nonetheless persisted in sexually harassing and abusing Ms. Bouhamidi despite knowing it was unwelcome.

118.    Defendant Torres' conduct violated clearly established rights belonging to Ms. Bouhamidi of which reasonable persons in Defendant Torres' position knew or should have known.

119.    Supervisory Defendants' deliberate indifference to the pervasive sexual assault by DWCF employees against DWCF inmates, who were all women, proximately caused the violation of Ms. Bouhamidi's equal protection rights by failing to implement effective practices, policies, and procedures that would have protected inmates, including Ms. Bouhamidi, from the substantial and known risk of serious harm posed by prison personnel using (and abusing) their authority and influence to sexually abuse inmates.

120.    Supervisory Defendants set in motion a series of events that they knew would cause an inmate in a similar situation as Ms. Bouhamidi to be deprived of her constitutional right to equal protection; but for the above acts or omissions of Supervisory Defendants, Ms. Bouhamidi would not have been subjected to a violation of her constitutional rights; and such a

deprivation was a natural and foreseeable consequence of these acts and omissions.

121.    Defendants' conduct was motivated by evil motive or intent and/or involved reckless or callous indifference to the federally protected rights of Ms. Bouhamidi.

122.    Defendants' actions and/or omissions caused, directly and proximately, Ms. Bouhamidi to suffer damages. The acts and inactions of Defendants caused Ms. Bouhamidi's damages.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants and grant:

(a)    Appropriate declaratory and other injunctive and/or equitable relief;

(b)    Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

(c)    All economic losses on all claims allowed by law;

(d)    Punitive damages on all claims allowed by law and in an amount to be determined at trial;

(e)    Attorney fees and the costs associated with this action including expert witness fees on all claims allowed by law;

(f)    Pre- and post-judgment interest at the lawful rate; and

(g)    Any further relief that this court deems just and proper, and any other relief as allowed by law and equity.

**PLAINTIFF REQUESTS A TRIAL TO A JURY ON ALL ISSUES SO TRIABLE.**

Dated this 1st day of February 2025.

*s/ David A. Lane* _____
David A. Lane
Liana Orshan
Maddie Lips

KILLMER LANE, LLP
1543 Champa Street, Suite 400
Denver, Colorado 80202
Phone: (303) 571-1000
dlane@killmerlane.com
lorshan@killmerlane.com
mlips@killmerlane.com

*Attorneys for Plaintiff Rajae Bouhamidi*